IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa Creighton, | ) | C/A No.: 1:16-2023-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On March 9, 2012, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on September 1, 2009. Tr. at 73, 74, 188–89, and

195–200. Her applications were denied initially and upon reconsideration. Tr. at 104–08, 109–13, 116–18, and 119–21. On July 22, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Robert C. Allen. Tr. at 29–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 10, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 17, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 51. She completed high school and some college. Tr. at 34. Her past relevant work ("PRW") was as a medical assistant. Tr. at 35. She alleges she has been unable to work since September 1, 2009. Tr. at 188.

2.    Medical History

Plaintiff presented to Lexington County Mental Health for an initial clinical assessment on December 21, 2009. Tr. at 276–77. She complained of depression, sleeplessness, decreased appetite, and loss of interest in relationships. Tr. at 276. She reported having witnessed her husband's murder. *Id.* She stated she had previously responded well to medications and treatment through Gaston Mental Health. *Id.*

Counselor Charles L. Griffin diagnosed post-traumatic stress disorder ("PTSD") and assessed a global assessment of functioning ("GAF") score[1] of 60.[2] Tr. at 277.

Plaintiff met with counseling intern Gwen Huckeriede ("Ms. Huckeriede"), on January 27, 2010. Tr. at 278. She reported having been molested by an uncle at age 10 or 11. *Id.* She indicated she had trouble reaching out to others for support and had difficulty talking to her parents because they tended to be judgmental. *Id.* Ms. Huckeriede encouraged Plaintiff to ask questions and to determine what she hoped to accomplish through counseling. *Id.*

Plaintiff was discharged from treatment at Lexington Mental Health on May 17, 2010, because she had failed to follow up for treatment. Tr. at 509.

On February 10, 2012, Plaintiff presented to the emergency room ("ER") at Hutcheson Medical Center, Inc., with complaints of shortness of breath, chest pain radiating to her back, weakness, fever, chills, coughing, and a recent 30-pound weight loss. Tr. at 284. The attending nurse observed Plaintiff to be wheezing and to have decreased air movement. Tr. at 285 and 286. However, a chest x-ray showed no acute abnormalities. Tr. at 300.

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[2] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR*.

Plaintiff presented to Lexington Medical Associates to establish primary care on June 12, 2012. Tr. at 346. She reported a history of asthma/chronic obstructive pulmonary disease ("COPD"), tobacco abuse, hypertension, acid reflux, and back pain that radiated to her left leg. *Id.* Nurse Practitioner Holly R. Owens ("Ms. Owens"), prescribed Soma for Plaintiff's back pain and encouraged her to engage in back exercises. Tr. at 347. She stated Plaintiff was prehypertensive and that she would prescribe medication if her blood pressure was elevated at her next visit. *Id.* She prescribed Ventolin and Spiriva for asthma/COPD, Chantix for smoking cessation, and Neurontin for postmenopausal symptoms. *Id.*

Plaintiff presented to the ER at Lexington Medical Center on July 1, 2012, with a complaint of bilateral hand tremors and shaky legs. Tr. at 547. A neurological examination was normal. *Id.* Wesley Frierson, M.D., indicated the tremors were likely related to anxiety. Tr. at 548.

Plaintiff complained of continuous back pain and some difficulty breathing on July 24, 2012. Tr. at 341. She reported some neuropathic pain in her lower extremities. *Id.* Ms. Owens observed Plaintiff to have full range of motion ("ROM") of all extremities, 5/5 muscle strength, and negative edema to her bilateral lower extremities. *Id.* She encouraged Plaintiff to discontinue smoking. *Id.* She prescribed Soma for Plaintiff's back pain and indicated she may refer her to pain management and physical therapy in the future. *Id.* She prescribed Symbicort and advised Plaintiff to continue to use Spiriva and Ventolin. *Id.* She increased Plaintiff's dosage of Neurontin for postmenopausal symptoms and neuropathic pain. *Id.*

On August 28, 2012, Plaintiff reported that she had discontinued Chantix on her own because it was increasing her irritability and she continued to smoke. Tr. at 338. She requested medication for anxiety and irritability. *Id.* She indicated she was only using Symbicort once daily, and Ms. Owens instructed her to take it twice a day as prescribed. *Id.* Plaintiff indicated Neurontin was providing no relief for her postmenopausal symptoms, and Ms. Owens discontinued it. *Id.* Ms. Owens prescribed Buspar for Plaintiff's irritation and anxiety and indicated she would consider prescribing Seroquel in the future. *Id.*

Plaintiff presented to J.P. Ginsberg, Ph. D. ("Dr. Ginsberg"), for a mental status examination on September 1, 2012. Tr. at 301–03. She indicated that she drove to the examination and was able to drive without problems. Tr. at 301. She reported feeling "mad all the time" and having difficulty communicating her point in conversation. *Id.* She stated her family doctor had prescribed Buspar, but that she felt it was ineffective. *Id.* Plaintiff reported sleeping for only three hours per night and bathing a couple of times per week. Tr. at 302. She endorsed suicidal thoughts and a history of suicide attempts. *Id.* She reported no recent violent outbursts, but indicated she had been arrested for domestic violence in the past. *Id.* She denied paranoia and visual hallucinations, but indicated she sometimes heard a voice that she could not make out. *Id.* She complained of a sad and depressed mood, feelings of guilt and worthlessness, and difficulty concentrating. *Id.* She stated she enjoyed playing with her puppy, had some friends, and received support from her family members. *Id.* Plaintiff denied attending church and stated she did not like shopping for groceries, but would visit stores if her mother or son drove her. *Id.* She

indicated she had a poor appetite and had lost 30 pounds over the prior six-month period. *Id.* She stated she cleaned her house and had "a tendency towards obsessive compulsiveness." *Id.* She reported having been sexually abused by an uncle at the ages of nine and 12 and having been raped and physically abused by her husband. *Id.* She indicated her son subsequently killed her husband, but was not prosecuted. *Id.* She reported nightmares that occurred twice a month. *Id.* She endorsed a history of alcohol and cocaine abuse, but denied current use. *Id.*

Dr. Ginsberg observed Plaintiff to be appropriately dressed and to have good hygiene and grooming. *Id.* He noted a resting tremor in Plaintiff's upper extremities. *Id.* He described Plaintiff as demonstrating a restricted affect, having poor eye contact, and appearing distracted. *Id.* He indicated Plaintiff's speech was normal. *Id.* He observed Plaintiff to have "noticeably slowed, vague and concrete, but not obviously loosened or disorganized" thoughts. *Id.* He indicated she was able to tell time on a clock, but could not make change. *Id.* He stated Plaintiff scored 33 out of 38 possible points on the Short Test of Mental Status. *Id.* He estimated her intelligence quotient ("IQ") to be average or possibly below. *Id.* He assessed diagnostic impressions of anxiety disorder, not otherwise specified ("NOS"); depression, NOS; sexual abuse as a child; sexual and physical abuse as an adult; and probable PTSD. Tr. at 303. He indicated a need to rule out mixed personality disorder. *Id.* Dr. Ginsberg concluded that "[t]here may be some invalidity or lack of consistency in her reports, however, she is reporting an extreme amount of social and relationship adjustment problems that are very serious and repeated, so that it is difficult to know what her credibility is." *Id.* He stated "overall severe axis II

characterological pathology seems indicated by the history she has given." *Id.* He indicated Plaintiff's hygiene and ADLs were "not directly impacted," but that her social interactions reflected "lifelong difficulties in forming successful intimate relationships and support systems. *Id.* He stated Plaintiff's cognitive functioning was "fair," but "less than expected given her report of having achieved an associate's degree." *Id.* He indicated Plaintiff was "marginally competent to manage her own funds." *Id.*

State agency consultant Timothy Laskis, Ph. D. ("Dr. Laskis"), completed a psychiatric review technique form ("PRTF") on October 15, 2012. Tr. at 60 and 67. He considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders, but concluded Plaintiff did not meet either Listing. Tr. at 60 and 67. He stated that there was insufficient evidence to substantiate the presence of an affective disorder; to assess the severity of Plaintiff's PTSD; or to determine whether she had restriction of activities of daily living ("ADLs"), difficulties in maintaining social functioning, or difficulties in maintaining concentration, persistence, or pace prior to her date last insured ("DLI") of June 30, 2011. Tr. at 60. Dr. Laskis considered Listings 12.04 and 12.06 for the current period. Tr. at 67–68. He found that Plaintiff had mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* He concluded that the medical evidence showed Plaintiff had the ability to perform simple, unskilled tasks, but should avoid public interaction. *Id.* Dr. Laskis indicated Plaintiff was moderately limited with respect to the following work-related abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended

periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. Tr. at 69–71.

Also on October 15, 2012, state agency medical consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), reviewed the evidence and concluded that it was insufficient for her to determine the severity of Plaintiff's physical impairments. Tr. at 66.

On October 16, 2012, Plaintiff reported that Buspar had not helped her depression and irritability. Tr. at 330. She requested a prescription for Seroquel. *Id.* Ms. Owens stated Plaintiff's slightly elevated blood pressure was consistent with prehypertension. *Id.* She discontinued Buspar and prescribed Seroquel. *Id.*

Plaintiff presented to J. Russell Williams ("Dr. Williams"), with an upper respiratory infection on November 16, 2012. Tr. at 325. She indicated she continued to smoke. *Id.* Dr. Williams observed Plaintiff to have wheezing and limited air movement. *Id.* He prescribed Doxycycline, Prednisone, Lortab, and Chantix. *Id.*

On December 19, 2012, state agency medical consultant Craig Horn, Ph. D. ("Dr. Horn"), indicated there was insufficient evidence in the record to assess the severity of Plaintiff's mental impairments on her DLI. Tr. at 99.

Plaintiff was transported to the ER at Lexington Medical Center on January 24, 2013, after reporting to her sister that she was suicidal and had taken three Lortab pills with Nyquil and alcohol. Tr. at 563. She appeared intoxicated, but was in no acute distress. Tr. at 558. She was discharged and instructed to follow up at Lexington County Mental Health within two days. Tr. at 567.

Plaintiff presented to Palmetto Health Baptist for pulmonary function testing on February 1, 2013. Tr. at 370. She reported dyspnea when climbing hills and stairs, a productive cough, and frequent wheezing. *Id.* Mark J. Mayson, M.D. diagnosed a severe obstructive ventilatory deficit without any significant bronchospastic component. Tr. at 371.

On February 13, 2013, Plaintiff requested that her dosages of Buspar and Seroquel be increased and that she be prescribed medication for sleep. Tr. at 452. Dr. Williams agreed to increase Plaintiff's psychiatric medication dosages and to prescribe Restoril for sleep, but he strongly advised her to seek psychiatric care. *Id.*

Dr. Williams completed a mental condition form on February 13, 2013. Tr. at 380. He indicated Plaintiff's mental diagnoses were PTSD and depression. *Id.* He indicated her medications included Buspar and Seroquel. *Id.* He indicated the medication had helped Plaintiff's condition, but that psychiatric care had been recommended through Lexington County Mental Health. *Id.* He described Plaintiff as being oriented to time, person, place, and situation; having an intact thought process; demonstrating appropriate thought content; displaying a normal mood/affect; having good attention/concentration; and showing good memory. *Id.* He stated he was "[n]ot qualified to say" whether Plaintiff

exhibited any work-related limitation in function due to her mental condition. *Id.* He indicated Plaintiff was capable of managing her own funds. *Id.*

Plaintiff presented to Kimberly Kruse, Psy. D. ("Dr. Kruse"), for a consultative examination on February 18, 2013. Tr. at 421–23. She reported that her husband was killed six years earlier. Tr. at 421. She indicated that her husband had been abusive and that her parents had been strict and had punished her "by whipping, which did leave marks." *Id.* She indicated she had been isolative and had not driven in a while. *Id.* She stated she was easily frustrated in social situations. *Id.* She reported nightmares and flashbacks. *Id.* She endorsed a history of three hospitalizations for alcohol abuse and depression. *Id.* She reported sleeping only a couple of hours each night. Tr. at 422. She denied using a computer, but indicated she enjoyed watching television and reading novels. *Id.* She stated she maintained her hygiene, did laundry, and prepared a shopping list for her son to use at the grocery store. *Id.* She indicated she occasionally talked to friends on the telephone. *Id.*

Dr. Kruse described Plaintiff's mood as "somewhat anxious" and her affect as "restricted." *Id.* She indicated Plaintiff was alert, oriented, and demonstrated normal psychomotor activity and speech. *Id.* She described Plaintiff's thought processes as logical, linear, and goal-directed. *Id.* She stated Plaintiff maintained appropriate eye contact. *Id.* She indicated Plaintiff had denied suicidal and homicidal ideations and had no overt psychosis or delusional process. *Id.* She estimated that Plaintiff's intelligence was average. *Id.* She observed Plaintiff to demonstrate intact neurocognitive abilities; to be able to recall three out of three objects from immediate memory and three out of three

10

objects after delay and interference tasks; to have no impairment to a controlled oral word association task; to be able to perform simple mathematical calculations; to have intact visual-spatial processing; and to demonstrate intact attention and auditory comprehension. *Id.* Dr. Kruse's diagnostic impressions were major depressive disorder ("MDD"), by history; anxiety disorder, NOS; history of alcohol abuse; and nicotine dependence. *Id.* She stated "[f]rom a neurocognitive perspective based on mini-mental status exam, she does appear capable of performing simple repetitive tasks." Tr. at 423. She indicated "[f]unctional limitations may present due to depression and anxiety," but that Plaintiff was able to communicate effectively, use appropriate judgment, understand and follow instructions, and manage funds appropriately. *Id.*

On March 5, 2013, Dr. Horn considered Listings 12.04 and 12.06 on the PRTF. Tr. at 82–83. He assessed Plaintiff as having mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* He completed a mental residual functional capacity ("RFC") assessment and indicated Plaintiff had moderate limitations in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting Tr. at 86–88. Dr. Horn indicated as follows:

> Claimant can perform unskilled work activity that does not require constant interaction with the general public.

1. Claimant is able to understand and remember simple instructions but could not understand and remember detailed instructions.

2. Claimant is able to carry out short and simple instructions but not detailed instructions. Claimant is able to maintain concentration and attention for periods of at least 2 hours.

3. Claimant would perform best in situations that do not require on-going interaction with the public.

4. Claimant is able to be aware of normal hazards and take appropriate precautions.

RATING SUMMARY: Overall, claimant's symptoms and impairments are severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public.

Tr. at 88.

Plaintiff presented to Thomas J. Motycka, M.D. ("Dr. Motycka"), for a consultative examination on March 15, 2013. Tr. at 425–28. She reported a history of three back surgeries. Tr. at 425. She described pain in her low back that radiated to her left leg and foot. *Id.* She indicated she had difficulty standing for longer than 20 minutes and had to lean to the right when sitting. *Id.* Dr. Motycka observed that Plaintiff had "a brisk gait, with normal carriage, when in our facility." *Id.* He also noted she was "smiling throughout the entire exam and sitting comfortably on the exam table not needing to fidget or reposition." Tr. at 426. He indicated Plaintiff had normal gesturing, made good eye contact, and was cooperative. *Id.* He observed Plaintiff's back to be nontender. *Id.* The noted the entire orthopedic examination was normal and showed Plaintiff to have normal range of motion testing, negative straight leg raising ("SLR") tests, 5/5 grip strength, normal walking and squatting abilities, no need for an assistive device, 5/5

muscle strength testing, and normal and symmetric reflexes. Tr. at 427. He indicated an x-ray of Plaintiff's lumbar spine showed a straightening of lordosis, hypertrophied facets on the right at L5-S1, and posterior narrowing of the disc space at L5-S1. *Id.* He stated Plaintiff's x-rays and reports were most consistent with a history of L5-S1 discectomy. Tr. at 428.

State agency medical consultant Seham El-Ibiary, M.D. ("Dr. El-Ibiary"), completed a physical RFC assessment on March 27, 2013. Tr. at 84–86. He indicated Plaintiff could occasional lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an 8-hour workday; sit for a total of about six hours in an eight-hour workday; and frequently balance, stoop, and climb ladders, ropes, and scaffolds. Tr. at 84–85. He indicated Plaintiff should avoid concentrated exposure to extreme cold and hazards and should avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation, etc. Tr. at 85–86. Dr. El-Ibiary indicated there was insufficient evidence in the file to rate Plaintiff's physical impairments at her DLI. Tr. at 98.

On May 13, 2013, Plaintiff reported that she had stopped smoking within the prior month. Tr. at 448. She indicated she suspected Seroquel had caused her to gain 13 pounds. *Id.* Dr. Williams confirmed that Plaintiff's use of Seroquel had likely contributed to her weight gain. *Id.* He encouraged her to keep her scheduled appointment at the mental health clinic so she could have her medications adjusted. *Id.* He stated Plaintiff's recent lab work was in good order. *Id.*

Plaintiff presented to Lexington Mental Health for an initial clinical assessment on July 1, 2013. Tr. at 499–503. She complained of depression, panic attacks, and symptoms of PTSD. Tr. at 499. She reported that her son had murdered her abusive boyfriend in front of her and that she had been physically, emotionally, and sexually abused in the past. *Id.* She indicated a history of suicide attempts, but denied homicidal thoughts, self-mutilation, and other risk-taking behavior. *Id.* She reported being isolated and socializing primarily with her parents. Tr. at 500. Ron Barrigar, LISW-CP ("Mr. Barrigar"), described Plaintiff as having a neat appearance and hygiene; showing a cooperative attitude; demonstrating an appropriate affect; having an anxious and depressed mood; speaking with a normal rate and tone; demonstrating a normal thought process; endorsing a phobia of snakes; having suicidal thought content; experiencing auditory hallucinations of her name being called out; feeling like people were watching her; being alert and oriented to person, place, time, and situation; having poor decision making that adversely affected herself; acknowledging, but failing to understand her problems; having intact memory; being able to concentrate; and having an average fund of knowledge. Tr. at 501–02. He indicated Plaintiff was sleeping at short intervals; had adequate appetite/eating patterns; reported decreased energy; and endorsed decreased libido. Tr. at 502. He diagnosed recurrent MDD, panic disorder, and PTSD and assessed a GAF score of 55. *Id.*

Plaintiff presented to the ER at Lexington Medical Center on July 17, 2013. Tr. at 571. She reported having been injured in a car accident six days earlier and complained

of left chest and breast pain that had gradually worsened. *Id.* She was diagnosed with a rib fracture and received a prescription for Oxycodone. Tr. at 573.

On July 31, 2013, Plaintiff reported feeling irritable, sad, and anxious; having three to four panic attacks per week; sleeping poorly; and being unable to concentrate. Tr. at 504. She indicated she had discontinued Seroquel three weeks earlier because it had caused her to gain 35 pounds. *Id.* She indicated she had recently been injured in a car accident and had been charged with driving under the influence ("DUI"). *Id.* She stated she enjoyed bowling and working in her yard. *Id.* Meredith L. Mona, M.D. ("Dr. Mona"), indicated Plaintiff was fidgety, anxious, and maintained poor eye contact during a mental status examination. Tr. at 505. She noted Plaintiff was alert and oriented; had normal speech; denied hallucinations and delusions; demonstrated a logical and goal-directed thought process; denied suicidal and homicidal ideation, and demonstrated no abnormal movement. *Id.* She diagnosed MDD, PTSD, and panic disorder. *Id.* She assessed a GAF score of 55. *Id.* She discontinued Plaintiff's prescriptions for Buspar and Seroquel and prescribed Pristiq. *Id.*

Mr. Barrigar completed a medical source statement on July 31, 2013. Tr. at 516–21. He indicated he had seen Plaintiff for one-hour sessions twice a month. Tr. at 516. He stated Plaintiff's diagnoses included MDD, PTSD, and panic disorder. *Id.* He assessed Plaintiff's GAF score to be 55. *Id.* He stated Plaintiff was motivated for treatment and was addressing her issues. *Id.* He indicated Plaintiff's prognosis was guarded. *Id.* Mr. Barrigar identified Plaintiff's symptoms as decreased energy; thoughts of suicide; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; generalized persistent

15

anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; persistent disturbances of mood or affect; change in personality; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions, which are a source of marked distress; easy distractibility; memory impairment; sleep disturbance; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week. Tr. at 517. He stated Plaintiff was unable to meet competitive standards with respect to the following mental abilities and aptitudes: understand and remember very short and simple instructions; carry out very short and simple instructions, maintain attention for two-hour segment; sustain an ordinary routine without special supervision; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially-appropriate behavior; and adhere to basic standards of neatness and cleanliness. Tr. at 518–19. He stated Plaintiff had no useful ability to function with respect to the following mental abilities and aptitudes: remember work-like procedures; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal

work stress; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; travel in unfamiliar places; and use public transportation. *Id.* He indicated Plaintiff did not have a low IQ or reduced intellectual functioning. Tr. at 519. He stated Plaintiff's psychiatric condition exacerbated her chronic back pain. *Id.* He assessed Plaintiff as having extreme restriction of ADLs; extreme difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence, or pace; and four or more episodes of decompensation within a 12-month period that had each lasted for at least two weeks. Tr. at 520. He indicated Plaintiff had a "[m]edically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support" and a "[c]urrent history of 1 or more year inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." *Id.* He further indicated Plaintiff had "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home." *Id.* He estimated Plaintiff was likely to be absent from work more than four days per month because of her impairments or treatment. Tr. at 421. He stated Plaintiff's impairment had lasted or was expected to last for a period of 12 months or longer. *Id.* He indicated Plaintiff was not a malingerer. *Id.* He stated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations he

17

described. *Id.* He noted Plaintiff was "unable to concentrate & panic attacks does [sic] not allow her to work with public." *Id.* He indicated alcohol or substance abuse did not contribute to any of Plaintiff's limitations. *Id.* Finally, he stated Plaintiff was capable of managing benefits in her own best interest. *Id.* Dr. Mona also signed the form. *Id.*

Plaintiff reported decreased exercise tolerance on October 21, 2013. Tr. at 527. She indicated she was doing well on Pristiq. *Id.* Dr. Williams observed Plaintiff to have normal respiratory rhythm and effort; clear bilateral breath sounds; normal heart rate and rhythm; no peripheral edema; intact cranial nerves; 2+ and symmetric deep tendon reflexes; normal sensory examination to light touch and pinprick; and normal motor examination. Tr. at 528. He described Plaintiff as being oriented to person, place, and time; having intact insight and judgment; demonstrating normal affect; and having unimpaired recent and remote memory. *Id.* He noted Plaintiff's hypertension appeared to have resolved. Tr. at 529. He recommended that Plaintiff focus on weight loss and conditioning to improve her exercise tolerance. *Id.*

Plaintiff presented to Amr Khalafallah, M.D. ("Dr. Khalafallah"), for a mental health follow up visit on November 4, 2013. Tr. at 610–11. She complained that Pristiq did not work well and that she was unable to afford Ambien. Tr. at 610. She indicated she was taking her medication regularly and denied side effects. *Id.* Dr. Khalafallah indicated Plaintiff claimed she drank rarely, but was "minimizing" her alcohol use. *Id.* He noted no

abnormalities on a mental status examination. Tr. at 610–11. He discontinued Pristiq and Ambien, prescribed Paxil and Trazodone, and assessed a GAF score of 50.[3] Tr. at 611.

Plaintiff complained of increased coughing and shortness of breath on April 30, 2014. Tr. at 606. Dr. Williams noted she had resumed smoking over the prior six-month period. *Id.* Plaintiff also reported craving sweets and experiencing increased thirst and urination. *Id.* Dr. Williams indicated Plaintiff's breath sounds were somewhat distant, but that she had no obvious wheezing or rhonchi. Tr. at 607. He stressed to Plaintiff the importance of smoking cessation and advised her to use Ventolin prior to activity and to continue using Symbicort and Spiriva. *Id.* He noted Plaintiff's glucose was mildly increased, but that her hemoglobin A1c was well-controlled. *Id.* He advised her to follow up in two months for a fasting glucose test, but indicated her increased thirst and excessive urination could be related to her medical regimen. Tr. at 608.

On June 30, 2014, Plaintiff indicated she was no longer taking Symbicort because she was afraid it would make her gain weight. Tr. at 604. She reported she continued to smoke, but indicated she was tolerating ADLs well and had stable exercise tolerance. *Id.* Dr. Williams observed Plaintiff's breath sounds to be somewhat distant and noted she had mild prolongation of expiration dates. Tr. at 605. He advised Plaintiff that the steroid dosing in Symbicort would not make her gain weight. *Id.* He instructed her to resume use of the medication and to stop smoking. *Id.*

_____

[3] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV-TR.*

Mr. Barrigar completed a second medical opinion questionnaire on July 14, 2014. Tr. at 538–40. He indicated Plaintiff had poor or no ability to interact appropriately with the general public; maintain socially-appropriate behavior; travel in unfamiliar places; use public transportation; remember work-like procedures; understand and remember very short and simple instructions; maintain attention for two-hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; deal with normal work stress; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; and deal with stress of semiskilled and skilled work. Tr. at 538–39. He indicated Plaintiff had unlimited or very good ability to adhere to basic standards of neatness and cleanliness and fair ability to carry out very short and simple instructions, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and be aware of work hazards and take appropriate precautions. *Id.* He estimated Plaintiff would likely be absent from work more than twice a month because of her impairments or treatment. Tr. at 540. He indicated Plaintiff was capable of managing funds in her own best interest. *Id.* He noted that Plaintiff occasionally used alcohol. *Id.*

Plaintiff was hospitalized at Lexington Medical Center September 24–27, 2014. Tr. at 620. She presented to the ER with a complaint of shaking and shortness of breath that had started one day earlier. Tr. at 621. She reported sweating, having a fever, and feeling anxious. *Id.* Elizabeth Renwick, M.D. ("Dr. Renwick"), observed Plaintiff to appear extremely anxious and to demonstrate involuntary large tremors in her arms and legs. Tr. at 622 and 623. She assessed initial diagnoses of serotonin syndrome, depression, gastroesophageal reflux disease ("GERD"), PTSD, occasional tremors, medication side effects, and situational anxiety. Tr. at 625. She admitted Plaintiff to control her symptoms and to properly adjust her medications. *Id.*

On September 25, 2014, William Harold Bragdon, M.D. ("Dr. Bragdon"), performed a psychological evaluation. Tr. at 639–43. Plaintiff complained of problems with attention and concentration and requested that she be prescribed Adderall. Tr. at 639. She reported multiple stressors that included her father's health problems, unemployment, financial difficulties, awaiting a disability hearing decision, and having witnessed her son kill her husband in 2006. *Id.* She endorsed depressed mood, crying spells, feelings of hopelessness, situational panic attacks, agoraphobia, sleep disturbance, recurrent nightmares, and a recent 30-pound weight gain. Tr. at 640. She reported a recent one-week history of elevated and irritable mood with increased energy, distractibility, grandiosity, racing thoughts, increased activity, decrease need for sleep, talkativeness, and impulsivity with respect to substance use. *Id.* She denied recent hallucinations, but reported a history of auditory and tactile hallucinations of her dead husband. *Id.*

Dr. Bragdon observed Plaintiff to be cooperative; to maintain good eye contact; and to speak with normal rate, rhythm, and tone. Tr. at 642. He indicated Plaintiff was awake, alert, and oriented to self and place, but was only partially oriented to time. *Id.* He described Plaintiff's mood as depressed and her affect as blunted. *Id.* He indicated her thought process was linear, but her insight and judgment were impaired. *Id.* Plaintiff denied homicidal and suicidal ideation and current auditory and visual hallucinations, but she reported some paranoia. *Id.* Dr. Bragdon diagnosed depressive disorder, NOS, but indicated bipolar disorder should be considered as possible diagnosis. *Id.* He also diagnosed PTSD, panic disorder with agoraphobia, a history of alcohol abuse, borderline traits, serotonin syndrome, asthma, GERD, and COPD. *Id.* He assessed a GAF score of 50. Tr. at 643. He stated he suspected Plaintiff had developed a serotonin syndrome from her recent use of cocaine,[4] but that it could also be related to her recent change in antidepressants. *Id.* He recommended Plaintiff receive outpatient assessment for possible bipolar disorder before being placed on additional antidepressant or stimulant medications. *Id.* He prescribed Prazosin for recurrent nightmares. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 22, 2014, Plaintiff testified she last worked as a medical assistant in a physician's office in 2006. Tr. at 35. She stated she escorted patients from

---

[4] Plaintiff admitted that she had used cocaine three days prior to her hospital admission, and a urine drug screen was positive for cocaine. Tr. at 631 and 640.

the lobby to an examining room, checked their vital signs, and verified their medications. *Id.*

Plaintiff testified she had undergone three back surgeries between 1999 and 2004. Tr. at 36. She indicated she obtained some relief from the third surgery, but that her pain had worsened over time. Tr. at 37. She stated she was unwilling to pursue additional back surgery. Tr. at 49. She described her pain as radiating from her low back through her left leg and into her toes. Tr. at 47. She stated she needed to switch positions after sitting for 10 to 15 minutes. Tr. at 46. She estimated she could stand for 20 to 25 minutes. *Id.* She stated she could walk a block, but would experience shortness of breath. *Id.* She indicated she could bend to retrieve an item from the floor, but could not bend for an extended period. Tr. at 47. She indicated that a gallon of milk was the heaviest item she had recently lifted. Tr. at 48–49.

Plaintiff endorsed some breathing problems as a result of COPD. Tr. at 37. She indicated she had "cut down a lot" on her smoking and had not smoked "in about four months." Tr. at 38. She indicated she used a nebulizer once a day. Tr. at 45. She stated extremely hot or cold weather exacerbated her breathing difficulties. Tr. at 38. She testified her breathing problems made it difficult for her to walk long distances and to carry items while walking. Tr. at 45. She indicated her COPD had worsened since 2011. *Id.*

Plaintiff stated her panic attacks prevented her from working. Tr. at 38. She admitted that she had not received mental health treatment or taken medications for her mental health problems between 2009 and 2013. Tr. at 39. She indicated she had declined

to seek treatment during that period because she was unable to afford it. *Id.* She stated she had subsequently received treatment through free programs. *Id.* Plaintiff indicated she was taking Buspar and Trazodone for her mental health problems. *Id.* She testified she took Ambien and Seroquel to sleep and that Seroquel caused her to experience drowsiness and dizziness. Tr. at 43 and 47. She stated her social worker had recommended she follow up twice a month, but she was only able to follow up once a month because of transportation problems. Tr. at 40. She indicated she avoided crowds and sometimes avoided answering the telephone. Tr. at 50.

Plaintiff testified she lived alone, but that her mother lived next door. Tr. at 40–41. She indicated that she awoke around 9:00 a.m., prepared coffee, and washed clothes and dishes. *Id.* She denied preparing large meals. *Id.* She indicated she showered once or twice a week. Tr. at 44. She stated she watched television and visited with her mother in her mother's home on a typical day. Tr. at 42. She indicated she typically accompanied her mother on errands if her mother planned to be gone for more than an hour or two. Tr. at 44. She denied taking a daily nap, but estimated she took a nap twice a week. Tr. at 43–44. She indicated she had difficulty falling asleep because of nightmares. Tr. at 42–43. She testified she was unable to sustain concentration to read. Tr. at 43. She stated she sometimes visited the movie theater with a friend, but did not go out often. *Id.* She testified she attended church once every couple of months. Tr. at 49. She indicated her driver's license had been suspended because of unpaid tickets. Tr. at 44–45. She testified that her mother drove her to her medical visits and to the grocery store. Tr. at 41.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Robert Brabham, Jr., reviewed the record and testified at the hearing. Tr. at 50–54. The VE categorized Plaintiff's PRW as a medical assistant, *Dictionary of Occupational Titles* ("*DOT*") number 079.362-010, as light with a specific vocational preparation ("SVP") of six. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work; should avoid concentrated exposure to cold, heat, odors, dust, gases, fumes, unprotected heights, and dangerous equipment; and was limited to simple, unskilled work with occasional public contact. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified sedentary jobs with an SVP of two as a machine tender, *DOT* number 731.685-014, with 7,000 positions in the local economy and 275,000 positions nationally and an assembler, *DOT* number 739.684-094, with 8,000 positions in the local economy and in excess of 350,000 positions nationally. Tr. at 52.

The ALJ next asked the VE to consider a hypothetical individual of Plaintiff's vocational profile, but to assume the individual could not maintain adequate pace, persistence, or concentration to complete even unskilled, simple work. *Id.* He asked if that would eliminate all competitive work. *Id.* The VE confirmed that it would. *Id.*

Plaintiff's representative asked the VE to consider the limitations in the first hypothetical question, but to further assume the individual would be off task for 20 percent of the workday. Tr. at 53. She asked if the individual could perform the jobs

identified in response to the first question. *Id.* The VE indicated she could not perform any gainful work. *Id.*

Plaintiff's representative next asked the VE to assume the individual had to sit and stand at her option every 30 minutes. *Id.* She asked if the jobs would allow for such a limitation. *Id.* The VE responded that the jobs would allow for a sit/stand option as long as the individual could maintain productivity, but that the number of jobs would be reduced by 50 percent. *Id.*

Plaintiff's representative asked the VE to assume the individual would miss more than two days of work per month. Tr. at 53–54. The VE responded that would be considered excessive absenteeism and would not be consistent with gainful employment. Tr. at 54.

### 2.    The ALJ's Findings

In his decision dated October 10, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.
2.    The claimant has not engaged in substantial gainful activity since September 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: depression, post-traumatic stress disorder, post back surgeries, and chronic obstructive pulmonary disease (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with some limitations.

26

The claimant is limited to avoidance of concentrated cold, odors, dust, gases, and fumes. In addition, she should avoid unprotected heights and dangerous equipment. The claimant is limited to unskilled, simple work with occasional public contact.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 9, 1965 and was 44 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

Tr. at 14–23.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ did not consider Plaintiff's borderline age in applying the medical-vocational guidelines;

2)  the ALJ failed to account for Plaintiff's moderate limitations in concentration, persistence, or pace in the RFC assessment; and

3)  the ALJ did not adequately assess the medical opinions of record.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such

---

[5]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525 and § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii) and § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526 and § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S.

impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520 and § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h) and § 416.920(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

> 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.   Analysis

1.   Borderline Age

Plaintiff argues that the RFC the ALJ assessed would have required a finding that she was disabled if the case had been decided three months later. [ECF No. 22 at 28]. She maintains the ALJ erred in failing to consider whether the older age category applied in light of her borderline age at the time of the decision. *Id.* at 27. She contends the ALJ erred in applying the medical-vocational guidelines mechanically. *Id.* at 28–29.

The Commissioner argues that "the ALJ fully satisfied his legal obligation to consider whether to use the older age category." [ECF No. 24 at 18]. She maintains that the ALJ's recognition of Plaintiff's age category and his reference to the pertinent regulation reflect that he considered whether to apply the older age category. *Id.* at 19. She contends the ALJ's reliance on the testimony of a VE, who specifically considered Plaintiff's age, showed that he considered the borderline age situation. *Id.* at 19–20. She further maintains that the Social Security Administration's ("SSA's") Hearing, Appeals, and Litigation Law Manual ("HALLEX") § II-2-5-3-2 required the claimant to show vocational adversities for the medical-vocational guidelines to be applied non-mechanically and specified that that the ALJ may use the claimant's chronological age without explanation if the claimant failed to show additional adversities justifying use of the higher age category. *Id.* at 20. She argues Plaintiff produced no evidence to show that

she had vocational adversities that warranted application of the higher age category. *Id.* at 20–21.

In considering the claimant's age, the regulations recognize that "older age is an increasingly adverse vocational factor," and the ages of 45, 50, 55, and 60 may reflect different decisions even though the RFC, education, and past work experience are the same. SSR 83-10. In applying the medical-vocational guidelines, ALJs are not to apply age categories mechanically in borderline situations. *Id.*; *see also* 20 C.F.R. § 404.1563(b) and § 416.963(b) ("We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case."). Pertinent to the instant case, a borderline age situation exists if the following criteria are satisfied:

1)    The claimant has reached or will reach "the next higher age category within a few days to a few months after" the date of adjudication;

2)    "Using the claimant's chronological age would result in a not disabled determination"; and

3)    "Using the next higher age category to adjudicate the borderline period would result in a disabled determination."

SSA Program Operations Manual System ("POMS") DI 25015.006; *see also Harris v. Astrue*, No. 1:11-2442-TMC-SVH, 2012 WL 6761333, at *12 (D.S.C. Dec. 5, 2012),

aff'd, 2013 WL 30140 (D.S.C. Jan. 3, 2013) (providing guidance in identifying borderline age situations). Although the SSA has offered no "precise programmatic definition for the phrase 'within a few days to a few months,'" it has interpreted the term in several contexts to mean "a period not to exceed six months." SSA POMS DI 25015.006; HALLEX I-2-2-42(B)(1) (S.S.A.), 2016 WL 1167001; *see also* David D. Camp, *Social Security Revises Rules for Adjudicating Claims Involving a Borderline Age Issue*, 2016 No. 3, CURRENT SOC. SEC. NEWS, July 2016, at 14.

Plaintiff was born on January 9, 1965, and was within three months of her fiftieth birthday when the ALJ rendered his decision. *See* Tr. at 21 and 23. Under the medical-vocational guidelines, Plaintiff was classified as a younger individual age 45–49. *See* 20 C.F.R. § 404.1563 and § 416.963. The ALJ used medical-vocational guideline 201.21 as a framework in finding Plaintiff was "not disabled." *See* Tr. at 22. The same findings that directed a finding that Plaintiff was "not disabled" at age 49 would have directed a finding that she was disabled at age 50. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.21 (directing a decision of "not disabled" for an individual with a maximum sustained work capability limited to sedentary who is age 45–49; is a high school graduate or more; and has a history of skilled or semiskilled work without transferable skills), *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.14 (directing a decision of "disabled" for an individual with a maximum sustained work capability limited to sedentary who is age 50–54; is a high school graduate or more; and has a history of skilled or semiskilled work without transferable skills). In light of the foregoing, Plaintiff's case presented a borderline age situation. *See* SSA POMS DI 25015.006;

*Harris*, 2012 WL 6761333, at *12. Despite Plaintiff's borderline age, a review of the ALJ's decision reveals no explanation for his decision to rely on Plaintiff's chronological age as opposed to the higher age category. *See* Tr. at 21–22.

This court has recognized that "the majority of district courts in the Fourth Circuit find some discussion of the borderline age issue necessary when the claimant is significantly close in age to the higher age category." *Steen v. Colvin*, No. 4:13-3027-BHH, 2016 WL 536743, at *3 (D.S.C. Feb. 11, 2016), citing *e.g.*, *Hofler v. Astrue,* 2013 WL 442118, at *7 (E.D. Va. Jan. 9, 2013) (finding unpersuasive the defendant's argument that lack of vocational adversities and use of VE shows ALJ properly applied the grids where VE found skills nontransferable); *Harris*, 2012 WL 6761333, at *12–14 (remanding where the ALJ "should have decided whether it was more appropriate to use the higher age category," but "[s]uch an analysis is absent from the record"); *Pickett v. Astrue*, 895 F. Supp. 2d 720, 725 (E.D. Va. 2012) (remanding because "[t]he greater weight of authority leads to the conclusion that the ALJ's failure to expressly address the borderline age issue provides insufficient basis for review" where claimant was less than four months away from the higher age category); *Brown v. Astrue*, No. 3:07-2914-SB, 2009 WL 890116, at *12 (D.S.C. Mar. 30, 2009) (remanding where the ALJ failed to offer any analysis for applying the claimant's chronological age when claimant was four months shy of the higher age category); *Bush v. Astrue*, 2008 WL 867941, at *7–8 (S.D.W.Va. Mar. 28, 2008) (finding the Commissioner's decision was not supported by substantial evidence where the ALJ failed to explain his choice of age category when claimant was 116 days from a higher age category). *But see Gray v. Colvin*, No. 5:14-

1172-JMC, 2015 WL 5782076, at *15–16 (D.S.C. Sept. 30, 2015) (accepting Report and Recommendation finding borderline age argument to be without merit in case where the ALJ's decision was issued "only months before" the plaintiff's fiftieth birthday because the ALJ relied on a VE's testimony to find that she could perform work). In *Ash v. Colvin*, No. 2:13-47, 2014 WL 1806771, at *8 (N.D.W.Va. May 7, 2014), the court noted that the United States Court of Appeals for the Fourth Circuit had not addressed the issue, but that most district courts within the Fourth Circuit had found that ALJs must explicitly analyze the borderline age issue to allow the reviewing court to determine if the decision was based on substantial evidence. *Id.* at *8 (citations omitted).

The undersigned has considered, but rejects the Commissioner's argument that the ALJ's evaluation of whether to use the higher age category is reflected by his recognition of Plaintiff's age, his reference to the pertinent regulation, and his reliance on the testimony of a VE. The Commissioner is essentially asking the court to find that the ALJ was not required to explicitly consider the borderline age situation because he used the medical-vocational guidelines as a framework instead of relying on them to direct a decision. The ALJ used the medical-vocational guidelines as a framework and obtained testimony from a VE because Plaintiff had a combination of exertional and non-exertional limitations. *See* 20 C.F.R. § 404.1569a(d) and § 416.969a(d). As a practical matter, it makes little sense to find an ALJ is not required to consider the borderline age issue for an individual whose exertional limitations would have required consideration of the issue, but who was brought outside the medical-vocational guidelines based on additional limitations. Such an interpretation would make it less likely that individuals

35

with more limitations would be found disabled. In addition, 20 C.F.R. § 404.1569a(d) and § 416.969a(d), indicate that the ALJ should "not directly apply the rules" in cases involving combined exertional and non-exertional limitations "unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations." As discussed above, the next higher age category would have directed a conclusion that Plaintiff was disabled based on her strength limitations. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.21, *with* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.14. Therefore, the Commissioner's reliance on the ALJ's use of VE testimony and the medical-vocational guidelines as a framework did not absolve him of responsibility to explicitly consider whether to use the next higher age category.

The Commissioner directs the court to HALLEX II-5-3-2 (S.S.A.), 2003 WL 25498826,[7] which was applicable at the time of the ALJ's decision, and argues that Plaintiff has failed to prove that she had additional vocational adversities that would require the ALJ to explain his use of her chronological age, as opposed to the older age

---

[7] In *Ash*, 2014 WL 1806771, at *7, the court pointed to an inconsistency between HALLEX and POMS regarding the ALJ's duty to explain his consideration of the borderline age situation. It indicated that HALLEX II-5-3-2 provided "[a]bsent a showing of additional adversity/ies justifying the use of the higher age category, the adjudicator will use the claimant's chronological age" and "need not explain his or her use of the claimant's chronological age," whereas POMS DI 25015.005 specified "[w]hen a borderline age situation exists, you must explain your decision to use the next higher age category or your decision to use the claimant's chronological age and explain the specific factors supporting your determination.").[7] *Ash*, 2014 WL 1806771, at *7. The undersigned notes that HALLEX I-2-2-42, which replaced HALLEX II-5-3-2 on March 25, 2016, requires that the ALJ "explain in the decision that he or she considered the borderline age situation, state whether he or she applied the higher age category or the chronological age, and note the specific factor(s) he or she considered. HALLEX I-2-2-42(C)(5) (S.S.A.), 2016 WL 1167001. Therefore, the regulatory guidance now consistently requires that ALJs explain how they considered the borderline age situation.

category. [ECF No. 24 at 20–21]. Pursuant to HALLEX II-5-3-2, "one finds additional vocational adversity(ies) if some adjudicative factor(s) is relatively more adverse when considered in terms of that factor's stated criteria, or when there is an additional element(s) which has adverse vocational implications." In *Ash* 2014 WL 1806771, at *7–8, the court considered a similar argument and looked to relevant cases both within and outside the Fourth Circuit. It concluded that "the extent to which the ALJ is required to provide analysis and make express findings in borderline age situations often depends on whether additional vocational adversities exist in the record." *Ash*, No. 2:13-47, 2014 WL 1806771, at *8, citing *Bowie v. Commissioner of Social Security*, 539 F.3d 395, 402 (6th Cir. 2008) ("holding that the ALJ's disability determination was supported by substantial evidence even though it lacked an explicit discussion of borderline age because there was 'simply no evidence in the record that [the claimant] suffered from any additional vocational adversities that might justify placing her in the next higher age category'"); *Lewis v. Colvin*, 2013 WL 1283837 (E.D. Mo. Mar. 27, 2013) ("Because additional vocational adversities are present in this case, namely, the presence of additional and significant non-exertional impairments which infringe upon plaintiff's occupational base, as determined by the plaintiff's RFC and as testified to by the vocational expert, the ALJ was required to consider whether plaintiff should be classified as a person "closely approaching advanced age."); *Hofler*, 2013 WL 442118, at *8 ("The Court finds unpersuasive Defendant's argument that Mr. Hoffler's lack of vocational adversities, as well as the ALJ's consultation of a vocational expert, shows the ALJ properly applied the Grids as guided by the Social Security Rulings, HALLEX, and POMS."). Thus,

reviewing courts have only validated the Commissioner's argument that HALLEX II-5-3-2 does not require an express discussion of the borderline age issue in cases where the plaintiffs had no additional vocational adversities.

Here, the ALJ assessed an RFC that restricted Plaintiff to a reduced range of sedentary work. *See* Tr. at 16. He found that Plaintiff should avoid concentrated exposure to unprotected heights, dangerous equipment, cold, odors, dust, gases, and fumes. *Id.* He also limited Plaintiff to unskilled, simple work with occasional public contact. *Id.* Because the ALJ limited Plaintiff to less than the full range of sedentary work, her RFC included additional factors that would make it more difficult for her to adjust to other work. *See Ash*, 2014 WL at 1806771, at *9 (providing that the plaintiff's significant non-exertional limitations were additional vocational adversities). Thus, the record supports a finding that Plaintiff had additional vocational adversities. Therefore, even if the court were to accept Plaintiff's argument that HALLEX II-5-3-2 did not mandate a discussion of the borderline age issue, a discussion would have been necessary in this case because of Plaintiff's additional vocational adversities.

In light of the foregoing, the undersigned recommends the court find the ALJ erred in failing to explicitly consider Plaintiff's borderline age in his decision.

2.      Additional Allegations of Error

In light of the foregoing recommendation, the undersigned declines to analyze Plaintiff's remaining allegations of error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

March 16, 2017                                  Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).